**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| Q EXCELSIOR ITALIA SRL, | Civil Action No. |
| Plaintiff, | Judge: |
| v. | **COMPLAINT** |
| ZURICH AMERICAN INSURANCE COMPANY. | **JURY TRIAL DEMANDED** |
| Defendant. | |

Plaintiff Q Excelsior Italia Srl, the owner of the Westin Excelsior Rome ("Excelsior" or "Plaintiff"), by and through its undersigned attorneys, as and for its Complaint against Zurich American Insurance Company ("Zurich or "Defendant"), alleges as follows:

**INTRODUCTION**

1. This diversity action for breach of contract and declaratory relief arises out of Defendant's refusal to provide insurance coverage under an "all risk" property policy for Excelsior's significant property and business interruption losses arising out of the novel coronavirus outbreak and ongoing COVID-19 pandemic. Despite issuing broad property and business interruption insurance policies that expressly include coverage for Cancellation of Bookings due to an outbreak of infectious disease, Defendant has refused to compensate Excelsior for its losses.

2. Excelsior owns the Westin Excelsior Rome, an historic luxury hotel in the heart of Rome, Italy. The Westin Excelsior Rome is a Marriott-flagged hotel, which Marriott operates through an Operating Services Agreement. When the coronavirus pandemic began to sweep through Europe in early 2020, travel and tourism were halted abruptly, and the Westin Excelsior Rome's bookings – and in turn, business income – dropped to zero.

1

3. As a busy destination hotel in an early hotspot of the pandemic, Excelsior has suffered significant business interruption losses, including but not limited to losses from the cancellation of bookings and refunds/rebates given to hotel guests due to the pandemic, prevention of access of guests to the hotel property, and expenses incurred to protect the property and continue operations as normally as possible. Further, despite all precautions, the Excelsior has suffered from the actual presence of COVID-19 on its property, among both guests and staff.

4. Excelsior's losses are due not only to the cancellation of bookings, but the numerous and evolving mandates from local and national authorities around the world and the European Union, issued in response to the COVID-19 crisis, many of which have expressly recognized that COVID-19 causes direct physical loss of and/or damage to property (the "Orders"). The Orders, most of which have been renewed and/or extended multiple times, have devastated Excelsior's business.

5. As the owner of a world-renowned travel destination, Excelsior had the foresight to insure against the risks posed by pandemics that can impose a crippling strain on the travel industry. More specifically, in exchange for a substantial premium, Excelsior paid to participate in Marriott's "all risks" property insurance program purchased from Defendant. The policy issued by Defendant (the "Policy") provides $200 million per occurrence in coverage to insured locations, including the Westin Excelsior Rome. Together with a layer of excess policies also sold by Defendant to cover Excelsior, the insured properties have a total of $1.5 billion per occurrence in coverage available. Among other things, the Policy provides coverage for:

- Loss resulting from the interruption of Excelsior's normal business operations;

- Loss caused by restriction of access to property, including specifically if caused by an order issued by a civil authority;

- Loss caused by impairment of ingress to or egress from property, even when the insured property itself is not damaged;

- Loss caused by cancellation of bookings, including specifically as a result of the outbreak of contagious disease;

- Costs to clean and decontaminate Excelsior's premises; and

- Extra expenses incurred to continue Excelsior's business as nearly normal as practicable.

6. Excelsior has experienced losses that fall within the Policy's coverage, as the presence of the coronavirus and the resulting COVID-19 disease have caused direct physical loss of and/or damage to Excelsior's hotel property covered by the Policy.

7. Relying on its "all risk" insurance, Excelsior promptly notified Defendant and made a claim for coverage under the Policy. Excelsior provided documentation of its millions of dollars of covered costs and losses, and then waited for nearly a year with no decision on the claim from Defendant.

8. In this time of crisis, Defendant completely ignored Excelsior's claim. Despite receiving multiple detailed notices of claim explaining the precise type and magnitude of loss suffered at the Westin Excelsior Rome, Defendant failed to respond or reimburse Excelsior.

9. Based on Defendant's positions in other lawsuits across the country, Excelsior expects Defendant to argue that the coronavirus pandemic does not constitute direct physical loss or damage and/or that Policy provisions operate to bar coverage for Excelsior's pandemic-related losses. This interpretation contravenes the plain meaning of the coverage language and case law in Illinois and across the country interpreting the same or similar policy provisions. Moreover, in direct contrast to other policies in the marketplace, the Policy expressly contains coverage for

cancellation of bookings as a result of communicable diseases, confirming that the presence of a virus, whether on or near insured property, can cause loss of or damage to property.

10. Defendant has refused to pay any amounts to Excelsior to date and, on information and belief, has not reimbursed pandemic-related losses for any of the insured properties under the Policy. As a result, Excelsior brings this action for breach of contract and declaratory judgment that it is entitled to the full amount of all risks coverage for its costs and losses.

## THE PARTIES

11. Plaintiff Excelsior is the owner and manager of the Westin Excelsior Rome hotel, located in Rome, Italy. Excelsior is a S.r.l. or *societa a responsabilita limitata* organized under the laws of Italy with its principal place of business in Italy.

12. Defendant Zurich is an insurance company organized under the laws of the State of New York with its principal place of business in Schaumburg, Illinois.

## JURISDICTION AND VENUE

13. This Court has jurisdiction over this dispute pursuant to 28 U.S.C. § 1332 because there is complete diversity among the parties and the amount in controversy exceeds $75,000 exclusive of interest and costs because, among other reasons, Plaintiff seeks insurance for more than $75,000 in losses.

14. This Court has general personal jurisdiction over Defendant because Defendant is a citizen of this State, and because Defendant has submitted to jurisdiction in this State by transacting business in this State and making a contract substantially connected with this State.

15. Venue is proper because, among other reasons, Defendant "resides" in the Northern District of Illinois.

**FACTUAL ALLEGATIONS**

**I.    The Coronavirus Outbreak**

16.    In December 2019, during the term of the Policy, an outbreak of an illness known as COVID-19 caused by a novel coronavirus formally known as SARS-CoV-2 was first identified in Wuhan, Hubei Province, China.  In an event that has not occurred in more than a century, a pandemic of global proportions then ensued, with the virus spreading quickly to Europe, where Italy was among the hardest hit countries.

17.    From the first reported case in Europe on January 24, 2020 to the present, the impact of the coronavirus and resulting COVID-19 disease has been staggering on life and property.  And, specifically, the impact on the travel and hospitality industry has been particularly acute.

18.    On January 30, 2020, the World Health Organization ("WHO") declared the first outbreak of the novel coronavirus a "public health emergency of international concern." Beginning February 22, 2020, Italian authorities reported clusters of infections in several regions in Italy, and those cases quickly spread to other European countries, both through travelers from Italy and without any known link to Italy or other countries with ongoing transmission.  The coronavirus was spreading quickly with no ability to trace the origins of new infections.

19.    Moreover, the nature of the novel coronavirus that causes COVID-19 has made its containment particularly challenging.  Numerous scientific studies and articles have identified that the virus can spread when droplets from an infected person land on objects and surfaces and then, after contact with the infected objects and surfaces, other individuals touch their eyes, nose, or mouth.

20.    Coronavirus has several modes of transmission.  Per the CDC and World Health Organization (the "WHO"), a person may become infected by: (1) coming into close contact (about

5

6 feet) with a person who has COVID-19; (2) absorbing respiratory droplets when an infected person talks, sneezes, or coughs; or (3) touching surfaces or objects that have the virus on them and then touching his or her mouth, eyes, or nose. Thus the coronavirus is present both in fluid particles in the air, and on surfaces.

21. Hotels in popular cities are particularly susceptible to the spread of the virus. Given the influx of COVID-19 cases in Italian citizens and travelers in and out of Italy, and the Westin Excelsior Rome's historic role as host to international and domestic guests, flight crews, conference attendees, and diplomatic events, the Westin Excelsior Rome was a vulnerable target for the damage and loss that the coronavirus pandemic causes.

22. COVID-19 is not only highly contagious but deadly. According to the Italian Department of Civil Protection, more than 2.9 million Italians have contracted the disease, of which more than 97,000 have died. In Europe as a whole, there have been more than 110 million cases, resulting in more than 2.5 million deaths.

23. Besides being deadly, the virus is challenging to contain because infected individuals can be asymptomatic—and thus unaware that they might be spreading the virus through the mere touching of objects and surfaces. Studies have estimated that more than 40% of infected individuals may never develop any symptoms.[1] But even individuals who appear healthy and present no identifiable symptoms of the disease will still spread the virus by merely breathing, speaking, or touching objects and surfaces.

24. The virus also continues to evolve, making it more difficult to contain. In late December 2020, a new strain of COVID-19 was detected, which is believed to be more contagious

---

[1] Erika Edwards, *Asymptomatic COVID-19 Cases May Be More Common Than Suspected*, NBC News (May 27, 2020, 12:43 PM), https://www.nbcnews.com/health/health-news/asymptomatic-covid-19-cases-may-be-more-commonsuspected-n1215481.

6

and easily spread, and its presence was confirmed in Italy, the United Kingdom, and the United States. Early research also suggests the new strain may be resistant to antiviral treatment, making it more dangerous.

## II.     Coronavirus Causes Direct Physical Loss of or Damage to Property

25.     Italy reported its first COVID-19 case on February 22, and on January 30, the WHO declared the pandemic a "Public Health Emergency of International Concern." On March 8, 2020, the Italian government issued a decree installing strict public health measures in affected areas, including social distancing. Three days later, these measures were extended to all of Italy, imposing far-reaching social-distancing measures.

26.     Italy's most significant round of Orders in March 2020 included the suspension of all education and sport activities, the limitation on movement of people (regardless of whether affected by the virus) unless justified by approved work, health or urgent needs, the cancellation of all public events and the prohibition of any large gathering of people in public or places (including cinemas, theatres, museums), as well as the closure of most shops and retail activities (other than certain essential services like grocery stores and pharmacies). These restrictions had the effect of cancelling all events, conferences, fairs, shows, and other large gatherings in Rome, which typically would attract visitors to the Westin Excelsior Rome and its bars and restaurant.

27.     By March 2020, it was clear that drastic action had to be taken to slow down the rate of infections. Many countries and local governments then began to impose sweeping restrictions on residents' daily lives and property to protect them and stop the spread. Most states restricted or prohibited the operation of non-essential business or required individuals to stay at home except for essential purposes. In an attempt to stop the international spread, severe travel restrictions, both in and out of Italy, were imposed in early 2020. The Westin Excelsior Rome

regularly saw tourists from China and South Korea before the pandemic; this travel was halted early in 2020.

28. Around the world, cities whose residents would normally travel to Europe were prevented from doing so by both European and domestic restrictions. Many countries, including Spain and the United States, banned entry of travelers coming from Italy, and others imposed a quarantine period for travelers coming from Italy. Even now, in early 2021, non-U.S. citizens are not permitted to enter (or return to) the United States within 14 days of being in Italy.

29. In addition to governmental travel bans, most international airlines stopped or severely reduced flights to or from Italy during Spring of 2020.

30. United States federal and local restrictions impacted travel to Italy and further demonstrated that COVID-19 causes property damage wherever it is present. For example, New York Mayor Bill De Blasio signed a series of stay-home orders and explained that these drastic measures were needed because of the unique characteristics of the novel coronavirus and, of particular relevance here, stating that "the virus physically is causing property loss and damage[.]"

31. The effects of the pandemic and the resulting Orders continue to cause business interruption losses for Excelsior. Months after the initial round of restrictions, the Italian government imposed renewed decrees in October and November 2020, further limiting access for travelers to the Westin Excelsior Rome.

32. Finally, the presence of COVID-19 and SARS-CoV-2 at and surrounding the Westin Excelsior Rome has caused and is continuing to cause physical loss of or damage to the insured property. Multiple guests and at least six employees of Excelsior tested positive for COVID-19, confirming that the virus was present at the Westin Excelsior Rome and caused loss or damage to the property.

33. Although droplets carrying the virus are not visible, they are nonetheless physical objects, carrying a physical substance, that attach to and cause harm to property. Studies have shown that the virus can survive on a whole range of surfaces, including stainless steel, wood, paper, plastic, glass, ceramic, cardboard, and cloth.

34. And unlike many other viruses that are unable to survive for long periods of time outside the body, the novel coronavirus is resilient and survives on surfaces for days and even weeks. The virus thus compromises the physical integrity of the structures it permeates and poses an imminent risk of physical damage to all other structures. The virus likewise renders such structures unusable.

35. The WHO has specifically identified health care settings as a setting where there is an increased chance of transmission due to the virus' ability to infect people who come in contact with surfaces with the virus and through certain medical procedures performed on COVID-19 patients.[2] For this reason, the WHO has stated that extra precautions must be taken in health facilities.

### III. Excelsior's Costs and Losses

36. Excelsior owns the Westin Excelsior Rome, which is part of the Marriott International, Inc. ("Marriott") chain of hotels.

37. The Westin Excelsior Rome is a historic 5-star hotel that has been operating since 1906. Part of its appeal and commercial success comes from its location on one of the most

---

[2] World Health Organization, *Coronavirus Disease (COVID-19): how is it transmitted?*, available at https://www.who.int/emergencies/diseases/novel-coronavirus-2019/question-and-answers-hub/q-a-detail/coronavirus-disease-covid-19-how-is-it-transmitted (last accessed on February 1, 2021).

celebrated and talked about streets of Rome, the Via Veneto, and its proximity to Rome's main attractions, including the Spanish Steps and the Borghese Gardens Gallery.

38. The Westin Excelsior Rome has 316 guest rooms, two bars, a restaurant, and 12 rooms to be rented out for events or meetings. Before the pandemic upended domestic and international travel, the Westin Excelsior Rome was popular among both national and international travelers, with more than half of its guests traveling from the United States. The Westin Excelsior Rome also routinely hosted guests from Asia, including China and South Korea. The Westin Excelsior Rome regularly hosted film shootings. Many of its rooms were also regularly occupied by United States airlines' flight crews.

39. Beginning in February 2020, however, as travel throughout Europe and around the world was severely restricted, the Westin Excelsior Rome's bookings decreased to virtually nothing. Events and filming ceased. With flights stopped or severely restricted, flight crews no longer needed hotel rooms in Rome. Huge amounts of guest bookings were cancelled in response to the pandemic and/or the Orders, and new bookings were not made. Other countries, including the United States, banned entry of non-citizens who had traveled to Italy, and Italy imposed its own travel restrictions on travelers from other countries.

40. As of March 31, 2020, all of the Westin Excelsior Rome's 316 guest rooms sat empty, bringing in no revenue. Bookings at the hotel's restaurant, bars, and meeting spaces were also cancelled or rendered impossible, decimating Excelsior's revenue.

41. Beginning with this complete halt in bookings and revenue, Excelsior incurred significant costs and losses caused by the coronavirus pandemic, costs and losses that are mounting every day.

42. As examples of its rising costs, Excelsior undertook costs and efforts to transition employees to working virtually, sanitize all public spaces, and install new safety measures to keep its premises safe and sanitized. Excelsior faced additional financial hardship when it was forced to renegotiate its loan for the Westin Excelsior Rome due to lack of guest revenue directly resulting from the pandemic and the Orders.

## IV. The Policy

43. In exchange for a substantial premium, Zurich sold Marriott (for the benefit of participating hotels, including the Westin Excelsior Rome) an "All Risks" Commercial Property Insurance Policy No. PPR 3700638-17 for policy period April 1, 2019 to April 1, 2020 (the "Zurich Policy"). Zurich Policy at 10 of 135. The Zurich Policy is attached hereto as Exhibit 1.[3]

44. The Policy identifies the Named Insured as Marriott International and provides that other entities that operate Marriott hotels and are identified by Marriott will also be insureds under the Policy. Excelsior was also provided a Certificate of Insurance confirming the Westin Excelsior Rome's insured status under the Policy. Accordingly, Excelsior is an Insured under the Policy.

45. The Policy Limit is $1.5 billion per occurrence, subject to a $25,000 deductible per Occurrence.

46. The Policy is designed to cover exactly the type of costs and losses Excelsior has suffered due to the COVID-19 pandemic: losses due to interruption by communicable disease, and costs and losses arising out of the physical loss of its property or damage to its property.

47. Unless damage is clearly included within a listed Limit of Liability, the full Policy Limit of the Policy is available for Excelsior's damages.

---

[3] Despite requests to Marriott, who procured the Policy on Excelsior's behalf, Excelsior has only been provided a redacted version of this Policy.

48. Unless otherwise stated, the Limits of Liability in the Policy are on a per occurrence basis.

49. "Occurrence" is defined as "the sum of all loss or damage insured against, irrespective of the number of locations involved, arising out of or caused by any one disaster, loss or series of disasters, accidents or losses arising out of one event." Policy at 67 of 79.

50. The Policy contains a broad grant of coverage for property damage and time element coverage, stating that they cover "all risks of direct physical loss of or damage, except as hereinafter excluded." Policy at 15 of 79.

51. The Policy's Time Element coverage provides: "This Policy insures Time Element loss, as provided in the Time Element Coverages, directly resulting from direct physical loss or damage of the type insured by this Policy," including "Business Interruption Loss[:] the Actual Loss Sustained by the Insured… during the Period of Liability," and "Extra Expense loss[:] the reasonable and necessary extra costs incurred by the Insured…during the Period of Liability." Policy at 35-37 of 79.

52. **Period of Liability** is defined as "the period: a) starting from the time of direct physical loss or damage of the type insured against; and b) ending when with due diligence and dispatch the building and equipment could be: (i) repaired or replaced; and (ii) made ready for operations, under the same or equivalent physical and operating conditions that existed prior to the damage." The **Period of Liability** is not limited by the expiration of the Policy. Policy at 49-50 of 79.

53. For Cancellation of Bookings coverage specifically, **Period of Liability** means "The length of time for which loss may be claimed shall not exceed such length of time as would be required with the exercise of due diligence and dispatch to restore the Insured's business to the

12

condition that would have existed had no loss occurred and shall include the time required to make the premises conform to the order of a competent public authority, beginning with the interruption or interference with the business and ending not later than 365 days thereafter." Policy at 46 of 79.

54. As part of the Policy's Time Element coverage, the Policy covers Excelsior's actual loss sustained, loss of rents, and Extra Expense.

55. The Declarations page does not list a sublimit for Business Interruption.

56. "Extra Expense" means "extra expenses to temporarily continue as nearly normal as practicable the conduct of the Insured's business" and "extra costs of temporarily using property or facilities of the Insured or others, less any value remaining at the end of the Period of Liability for property obtained in connection with the above. Policy at 37-38 of 79.

57. For each occurrence, Extra Expense coverage is subject to a $200,000,000 sublimit.

58. The Policy also includes several specific special coverages with per occurrence sublimits, including but not limited to:

| Special Coverage | Per Occurrence Sublimit |
| --- | --- |
| Contingent Time Element | $200 million |
| Civil or Military Authority | 90 days |
| Ingress/Egress | 90 days |
| Leasehold Interest | $150 million |

59. The Policy specifically recognizes that the presence of a communicable or infectious disease causes direct physical loss of or damage to property, and as such is specifically insured against in the Cancellation of Bookings coverage. Specifically, the Policy provides:

This policy is extended to cover the Actual Loss Sustained by the Insured during a Period of Liability resulting from:

    **a.** The cancellation of, and/or inability to accept bookings or reservations for accommodation, and/or interference with the business at any Insured Location; and/or

> **b.** The cancellation of, and/or inability to accept bookings or reservations, and/or the interruption of, or interference with the business at any restaurant, spa, golf course, health club or other facility of the Insured at any Insured location

> All as a direct result of … the outbreak of contagious and/or infectious disease as well as restrictive guidance or travel advisories placed on a region or area by Centers for Disease Control, World Health Organization, or comparable authority … within a radius of 5 miles of an Insured Location to the extent such Time Element loss is not otherwise covered under this Policy such as under the Civil Authority or Military Authority, Ingress/Egress, or Contingent Time Element extensions.

Policy at 44-45 of 79.

60. The Cancellation of Bookings coverage extension is subject to a $5 million sublimit in the aggregate.

61. The Policy also covers Excelsior's "Decontamination Costs" as follows:

> If insured property is **contaminated** as a result of direct physical damage insured by this Policy and there is in force at the time of the loss any law or ordinance regulating contamination, including but not limited to the presence of pollution or hazardous material, including Asbestos, then this Policy covers, as a result of enforcement of such law or ordinance, the increased cost of decontamination and/or removal of such contaminated insured property in a manner to satisfy such law or ordinance. Additional Coverage applies only to that part of insured property so contaminated as a result of insured physical damage.

62. The Policy provides coverage for "Interruption by Civil or Military Authority." Specifically, the Policy provides:

> This Policy is extended to insure loss sustained by the Insured during the period of time when, as a result of physical loss or damage not otherwise excluded herein, to the kind of property not otherwise excluded herein and access to the property of the insured is impaired by order or action of civil or military authority.

Policy at 48 of 79.

63. For each occurrence, the Civil or Military Authority special coverage is subject to a 90-day time limitation.

64. The Policy's "Ingress/Egress" special coverage provides:

> This Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured due to the necessary interruption of the Insured's business due to impairment of ingress to or egress from an Insured Location, whether or not the premises or property of the Insured is damaged, provided that such impairment is a direct result of direct physical damage of the type insured by this Policy, to the kind of property not excluded by this Policy.

Policy at 44 of 79.

65. For each occurrence, the Ingress/Egress special coverage is subject to a 90-day time limitation.

66. The Policy contains numerous other special coverages that may cover Excelsior's ongoing costs and losses as it continues to battle COVID-19 and its long-term impact on the travel industry, including: Contingent Time Element, and Protection and Preservation of Property.

67. The Westin Excelsior Rome is an insured property under the Policy, and the insured damages include Excelsior's loss of gross earnings, extra expense, and increased costs.

68. Operating a hotel that relies on the possibility of international travel, Excelsior understood that it would be severely impacted in the event of a pandemic such as COVID-19, and it reasonably expected that the Policy would cover such losses arising from such a pandemic. Excelsior's reasonable expectation is based upon, among other things, the broad language in the Policy, the express coverage for losses resulting from contagious disease, the express coverage for decontamination costs, and the fact that the Policy does not contain language excluding losses resulting from viruses or diseases.

69. Moreover, none of the Policy's exclusions preclude Excelsior's claim for coverage. Rather, the "Contamination" exclusion only applies to traditional environmental and industrial pollution. It has no effect on claims arising from the presence of the novel coronavirus at or surrounding Excelsior's property, the constant imminent threat of its presence, or the associated government action in response to the pandemic.

70. Excelsior has paid all premiums due to Defendant to purchase the Policy, complied with all applicable duties under the Policy, and satisfied the applicable deductible.

### V. Excelsior's Claim for Coverage

71. In March 2020, when Italy was among the hardest-hit countries in the world by COVID-19, and the Westin Excelsior Rome had zero of its 316 rooms occupied, Excelsior submitted a detailed claim for coverage under the Policy. Excelsior provided an explanation and quantification of its losses to its broker to be provided to Defendant.

72. Defendant ignored Excelsior's claim.

73. Having received no response from Defendant for nearly ten months, Excelsior submitted a second claim on December 15, 2020, after new governmental orders by the Italian government restricted access to the Westin Excelsior Rome.

74. Again, Defendant ignored Excelsior's claim.

75. Upon information and belief, Defendant has taken the position that the Policy does not provide coverage for loss of revenue for the coronavirus outbreak because it does not involve "physical loss or damage to property." Further, Excelsior understands Defendant has taken the position that the annual aggregate limit for Cancellation of Bookings was exhausted by other program participants before the coronavirus outbreak.

76. In failing to respond to Excelsior's claim for coverage, Defendant ignores that COVID-19 and SARS-CoV-2 cause physical loss of or damage to Excelsior's property, and thus Excelsior's and losses are covered under the Policy's insuring agreements for Property Damage and Time Element and numerous special coverages, including, but not limited to, Contingent Time Element, Ingress/Egress, Protection and Preservation of Property, and Extra Expense. Finally, Defendant ignores that Excelsior's losses result from a number of causes other than the virus or

disease, including, but not necessarily limited to, the pandemic, governmental negligence, or the Orders, all of which are other covered causes of loss under the Policy and constitute direct physical loss of Excelsior's property and direct physical damage to Excelsior's property.

77. The total lack of response from Defendant sent a clear message that they do not intend to pay for all of, or indeed any of, Excelsior's significant costs and losses covered under the Policy.

78. Defendant's refusal to respond has further harmed Excelsior by depriving it of the benefit of the bargain it purchased in the Policy. Defendant's position has forced Excelsior to fight a two-front battle, both against the COVID-19 pandemic that decimated its business, but also to obtain coverage to which it is clearly entitled. Excelsior comes to this Court to force Defendant to provide the coverage Excelsior purchased and is owed under the Policy.

**FIRST CAUSE OF ACTION**
**(Breach of Contract)**

79. Excelsior repeats and realleges the allegations set forth in the foregoing paragraphs as if fully set forth herein.

80. The Policy constitutes a valid and enforceable contract between Excelsior and Defendant.

81. As described above, Excelsior has sustained, and is continuing to sustain, costs and losses covered under the Policy and during the Policy period.

82. Excelsior provided prompt notice of its costs and losses, performed all obligations required of it under the Policy, and/or was ready, willing, and able to perform its obligations under the Policy at the time Defendant refused to provide coverage to Excelsior under the Policy.

83. Under the terms of the Policy, Defendant must pay for any costs or losses covered under the Policy, subject only to policy limits, sublimits, time limits, and/or deductibles for specific coverages.

84. Defendant has not paid any amounts to Excelsior in connection with its claim. Instead, Defendant has asserted various inapplicable bases to wrongfully deny coverage for Excelsior's claim.

85. As a direct and proximate result of Defendant's breach of contract, Excelsior has suffered and will continue to suffer damages in an amount to be determined at trial, plus consequential damages, attorneys' fees, and pre- and post-judgment interest to the extent permitted by law.

## SECOND CAUSE OF ACTION
**(Declaratory Judgment)**

86. Excelsior repeats and realleges the allegations set forth in the foregoing paragraphs as if fully set forth herein.

87. Under the terms of the Policy, Defendant must for any costs or losses covered under the Policy, subject only to policy limits, sublimits, time limits, and/or deductibles for specific coverages.

88. As detailed above, Excelsior's costs and losses are covered under the Policy and are not excluded from coverage.

89. Defendant disputes its legal obligation to pay Excelsior's claim.

90. An actual and justiciable controversy presently exists between Excelsior and Defendant concerning the proper construction of the Policy, and the rights and obligations of the parties thereto, with respect to Excelsior's claim for costs and losses arising out of the coronavirus outbreak.

91. Excelsior seeks a declaratory judgment in favor of Excelsior and against Defendant declaring that Excelsior is entitled to coverage under the Policy.

92. A declaratory judgment would be useful in resolving this case or controversy. Excelsior's costs and losses are ongoing. By clarifying the parties' rights and duties under the Policy, a declaratory judgment would guide Defendant's treatment of Excelsior's covered, but unaccrued, costs and losses, in addition to the significant damages Excelsior has already accrued. Because Excelsior's accrued costs and losses have not yet ripened such that a final amount of damages can be ascertained, the declaratory judgment claim would afford Excelsior relief independent of the breach of contract claim.

## **PRAYER FOR RELIEF**

WHEREFORE, Excelsior prays for relief as follows:

a. On the First Cause of Action, Excelsior requests that the Court enter judgment against Defendant, awarding Excelsior damages in an amount to be determined at trial, plus consequential damages, attorneys' fees, and pre- and post-judgment interest to the extent permitted by law;

b. On the Second Cause of Action, Excelsior requests that the Court enter a declaratory judgment in favor of Excelsior against Defendant that Excelsior's costs and losses are covered under the Policy and declaring that Defendant is required to pay Excelsior, up to the applicable limits, for claimed amounts under the Policy.

c. For all Causes of Action, all pre-judgment and post-judgment interest as allowed by law and all costs incurred as a consequence of having to prosecute this lawsuit, including attorneys' fees; and

d. Excelsior requests such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

Excelsior hereby demands a trial by jury on all issues so triable.

Dated: March 1, 2021

By: */s/ Douglas A. Albritton*_____

Douglas A. Albritton (ARDC 6228734)
Jeffrey M. Hansen (ARDC 6269900)
Actuate Law, LLC
641 West Lake Street, 5th Floor
Chicago, Illinois 60661
(312) 579-3131
doug.albritton@actuatelaw.com
jeff.hansen@actuatelaw.com

Robin L. Cohen*
Meredith Elkins*
COHEN ZIFFER FRENCHMAN &
MCKENNA LLP
1350 Avenue of the Americas, 25th Floor
New York, New York 10019
Tel: (212) 584-1890
rcohen@cohenziffer.com
melkins@cohenziffer.com
(*Will move for leave to appear pro hac vice)

*Attorneys for Plaintiff Q Excelsior Italia Srl*