**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| Q EXCELSIOR ITALIA SRL, | : | Case No. 21 CV 1166 |
|  | : |  |
|  | : | Judge Gary S. Feinerman |
| Plaintiff, | : |  |
| v. | : | **AMENDED COMPLAINT** |
|  | : |  |
| ZURICH AMERICAN INSURANCE COMPANY. | : | **JURY TRIAL DEMANDED** |
|  | : |  |
| Defendant. | : |  |
|  | : |  |

Plaintiff Q Excelsior Italia Srl, the owner of the Westin Excelsior Rome ("Excelsior" or "Plaintiff"), by and through its undersigned attorneys, as and for its Amended Complaint against Zurich American Insurance Company ("Zurich or "Defendant"), alleges as follows:

## INTRODUCTION

1.     This diversity action for breach of contract and declaratory relief arises out of Defendant's refusal to provide insurance coverage under an "all risk" property policy for Excelsior's significant property and business interruption losses arising out of the novel coronavirus outbreak and ongoing COVID-19 pandemic.  Despite issuing broad property and business interruption insurance policies that expressly include coverage for Cancellation of Bookings due to an outbreak of infectious disease, Defendant has refused to compensate Excelsior for its losses.

2.     Excelsior owns the Westin Excelsior Rome, an historic luxury hotel in the heart of Rome, Italy.  The Westin Excelsior Rome is a Marriott-flagged hotel, which Marriott International, Inc. ("Marriott") operates through an Operating Services Agreement.  When the coronavirus pandemic began to sweep through Europe in early 2020, travel and tourism were halted abruptly, and the Westin Excelsior Rome's bookings—and in turn, business income—dropped to zero.

3.      As a busy destination hotel in an early hotspot of the pandemic, Excelsior has suffered significant business interruption losses, including but not limited to losses from the cancellation of bookings and refunds/rebates given to hotel guests due to the pandemic, prevention of access of guests to the hotel property, and expenses incurred to protect the property and continue operations as normally as possible.  Further, despite all precautions, the Excelsior has suffered from the actual presence of COVID-19 on its property, among both guests and staff.

4.      Excelsior's losses are due not only to the cancellation of bookings, but also the actual presence of COVID-19 particles on the insured property, as well as the numerous and evolving mandates from local and national authorities around the world and the European Union, issued in response to the COVID-19 crisis, many of which have expressly recognized that COVID-19 causes direct physical loss of and/or damage to property (the "Orders").  The Orders, most of which have been renewed and/or extended multiple times, have devastated Excelsior's business.

5.      As the owner of a world-renowned travel destination, Excelsior had the foresight to insure against the risks posed by pandemics that can impose a crippling strain on the travel industry.  More specifically, in exchange for a substantial premium, Excelsior paid to participate in Marriott's "all risks" property insurance program purchased from Defendant.  The policy issued by Defendant (the "Policy") provides $200 million per occurrence in coverage to insured locations, including the Westin Excelsior Rome.  Together with a layer of excess policies also sold by Defendant to cover Excelsior, the insured properties have a total of $1.5 billion per occurrence in coverage available.  Among other things, the Policy provides coverage for:

- Loss resulting from the interruption of Excelsior's normal business operations;

- Loss caused by restriction of access to property, including specifically if caused by an order issued by a civil authority;

- Loss caused by impairment of ingress to or egress from property, even when the insured property itself is not damaged;

- Loss caused by cancellation of bookings, including specifically as a result of the outbreak of contagious disease;

- Costs to clean and decontaminate Excelsior's premises; and

- Extra expenses incurred to continue Excelsior's business as nearly normal as practicable.

6.     Excelsior has experienced losses that fall within the Policy's coverage, as the presence of the coronavirus and the resulting COVID-19 disease have caused direct physical loss of and/or damage to Excelsior's hotel property covered by the Policy.

7.     Though microscopic, the coronavirus is a physical substance that attaches to, and remains on, Excelsior's property, physically permeating and altering the air around Excelsior's property, rendering the property unsuitable for its intended purpose and/or severely limiting Excelsior's use of the property and its business of hosting guests who have traveled from around the world.

8.     Excelsior had the confirmed presence of the coronavirus and/or COVID-19 at its covered property, the Westin Excelsior Rome.  The presence of the virus on the property caused direct physical loss and/or damage to insured property, and resulted in significant business interruption losses to Excelsior.

9.     Additionally, due to the constant presence of COVID-19, Excelsior has taken various actions to repair, rebuild, replace, protect, and preserve its properties, which also has caused Excelsior substantial losses.  For example, during the Policy's applicable periods of indemnity, Excelsior has incurred significant extra expenses incurred to remove the coronavirus

from its properties and to repair, protect, and preserve property by adding safety dividers and sanitation stations, and purchasing additional cleaning supplies, cleaning services, and personal protective equipment for its staff and guests. Yet even the most aggressive cleaning efforts cannot completely eliminate COVID-19 from Excelsior's properties, let alone reduce the imminent risk of its reintroduction to Excelsior's properties.

10. Thus, by attaching to the property and remaining in the air, the physical presence of COVID-19 in and on Excelsior's properties has caused physical loss or damage to those properties, and has rendered such properties dangerous and unfit for their intended purpose, and has resulted in massive losses covered under the Policy. Excelsior's various and substantial losses thus fall squarely in the coverage of the policy, including the Policy's basic property loss or damage and business interruption coverages as well as additional coverages, such as extra expense coverage, ingress and egress coverage, interruption by civil or military authority coverage, and spoilage coverage, among others described in Section VI infra.

11. Relying on its "all risk" insurance, Excelsior promptly notified Defendant and made a claim for coverage under the Policy. Excelsior provided documentation of its millions of dollars of covered costs and losses, and then waited for nearly a year with no decision on the claim from Defendant.

12. In this time of crisis, Defendant completely ignored Excelsior's claim. Despite receiving multiple detailed notices of claim explaining the precise type and magnitude of loss suffered at the Westin Excelsior Rome, Defendant failed to respond or reimburse Excelsior.

13. Based on Defendant's positions in other lawsuits across the country, Excelsior expects Defendant to argue that the coronavirus pandemic does not constitute direct physical loss or damage and/or that Policy provisions operate to bar coverage for Excelsior's pandemic-related

losses. This interpretation contravenes the plain meaning of the coverage language and case law in Illinois and across the country interpreting the same or similar policy provisions. Moreover, in direct contrast to other policies in the marketplace, the Policy expressly contains coverage for cancellation of bookings as a result of communicable diseases, confirming that the presence of a virus, whether on or near insured property, can cause loss of or damage to property.

14.     Defendant has refused to pay any amounts to Excelsior to date and, on information and belief, has not reimbursed pandemic-related losses for any of the insured properties under the Policy. As a result, Excelsior brings this action for breach of contract and declaratory judgment that it is entitled to the full amount of all risks coverage for its costs and losses.

## THE PARTIES

15.     Plaintiff Excelsior is the owner and manager of the Westin Excelsior Rome hotel, located in Rome, Italy. Excelsior is a S.r.l. or *societa a responsabilita limitata* organized under the laws of Italy with its principal place of business in Italy.

16.     Defendant Zurich is an insurance company organized under the laws of the State of New York with its principal place of business in Schaumburg, Illinois.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction over this dispute pursuant to 28 U.S.C. § 1332 because there is complete diversity among the parties and the amount in controversy exceeds $75,000 exclusive of interest and costs because, among other reasons, Plaintiff seeks insurance for more than $75,000 in losses.

18.     This Court has general personal jurisdiction over Defendant because Defendant is a citizen of this State, and because Defendant has submitted to jurisdiction in this State by transacting business in this State and making a contract substantially connected with this State.

19.     Venue is proper because, among other reasons, Defendant "resides" in the Northern District of Illinois.

## FACTUAL ALLEGATIONS

### I.     The Coronavirus Outbreak Leads to a Global Pandemic

20.     In December 2019, during the term of the Policy, an outbreak of an illness known as COVID-19 caused by a novel coronavirus formally known as SARS-CoV-2 was first identified in Wuhan, Hubei Province, China.  COVID-19 is a severe and highly contagious infectious disease that can cause serious illness and death.  Then, in an event that has not occurred in more than a century, a pandemic of global proportions ensued, with the virus spreading quickly to Europe, where Italy was among the hardest hit countries.

21.     From the first reported case in Europe on January 24, 2020 to the present, the impact of the coronavirus and resulting COVID-19 disease has been staggering on life and property.  And, specifically, the impact on the travel and hospitality industry has been particularly acute.

22.     On January 30, 2020, the World Health Organization ("WHO") declared the first outbreak of the novel coronavirus a "public health emergency of international concern." Beginning February 22, 2020, Italian authorities reported clusters of infections in several regions in Italy, and those cases quickly spread to other European countries, both through travelers from Italy and without any known link to Italy or other countries with ongoing transmission.  The coronavirus was spreading quickly with no ability to trace the origins of new infections.

23.     On March 11, 2020, the WHO declared the novel coronavirus and resulting COVID-19 infectious disease a global pandemic.[1]  As a declared pandemic, the coronavirus and/or

---

[1] WHO Director-General's opening remarks at the media briefing on COVID-19, World Health Organization (Mar. 11, 2020) *available at https://www.who.int/director-general/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-*

COVID-19 is present globally, including at Excelsior's covered locations as well as at its vendors'
and customers' properties and properties within 15 miles of its covered locations.

24.     Hotels in popular cities are particularly susceptible to the spread of the virus. Given
the influx of COVID-19 cases in Italian citizens and travelers in and out of Italy, and the Westin
Excelsior Rome's historic role as host to international and domestic guests, flight crews,
conference attendees, and diplomatic events, the Westin Excelsior Rome was a vulnerable target
for the damage and loss that the coronavirus pandemic causes.

25.     COVID-19 is not only highly contagious but deadly. According to the WHO, there
have been more than 11.9 million confirmed cases of COVID-19 in Italy, and more than 150,000
Italians have died.[2] In Europe as a whole, there have been more than 160 million cases, resulting
in more than 1.8 million deaths.[3]

## II.     Coronavirus Causes Direct Physical Loss of or Damage to Property

26.     The various modes of transmission of the coronavirus have made containment of
the coronavirus and/or COVID-19 particularly challenging. The WHO recognizes that the
coronavirus and/or COVID-19 can be transmitted through at least three different modes: (1)
person-to-person contact or airborne transmission via droplets; (2) contact with inanimate surfaces
impacted by the coronavirus, also known as "fomites"; and (3) contact with aerosolized particles

---

*covid-19---11-march-2020* (last visited Feb. 14, 2022).

[2] WORLD HEALTH ORGANIZATION, *WHO Coronavirus (COVID-19) Dashboard – Italy*,
https://covid19.who.int/ (last visited Feb. 14, 2022).

[3] WORLD HEALTH ORGANIZATION, *WHO Coronavirus (COVID-19) Dashboard*,
https://covid19.who.int/region/euro/country/it (last visited Feb. 14, 2022).

that remain in the air in highly populated and indoor areas.[4]  Thus, the coronavirus is present both in fluid particles in the air, and on surfaces.

27.     First, according to the WHO, the coronavirus and/or COVID-19 spreads primarily between persons who are in close contact with each other, usually about three feet.[5]

28.     The virus is spread when uninfected persons inhale droplets that carry the coronavirus from infected persons or otherwise come into contact with infected droplets through their mucous membranes.[6]  This is called airborne transmission.  Droplets from an infected person can remain in the air for minutes or hours and remain on surfaces for days or weeks and thus affect real and personal property.

29.     Second, scientific studies have found that the coronavirus physically rests and remains on surfaces for up to twenty-eight days on a variety of materials, including glass, steel, vinyl, plastic, and paper-surfaces that are found throughout Excelsior's covered locations.[7]  Human

---

[4] *Transmission of SARS-CoV-2: implications for infection prevention precautions*, WHO Scientific Brief (July 9, 2020), *available at*  https://www.who.int/news-room/commentaries/detail/transmission-of-sars-cov-2-implications-for-infection-prevention-precautions (last visited Feb. 14, 2022).

[5] *Coronavirus disease (COVID-19): How is it transmitted?* World Health Organization (Dec. 23, 2020), *available at* https://www.who.int/news-room/questions-and-answers/item/coronavirus-disease-covid-19-how-is-it-transmitted (last visited Feb. 14, 2022).

[6] CDC, *Scientific Brief: SARS-CoV-2 and Potential Airborne Transmission* (last updated May 7, 2021), *available at* https://www.cdc.gov/coronavirus/2019-ncov/more/scientific-brief-sars-cov-2.html (last visited Feb. 14, 2022); *see also* CDC, *How COVID-19 Spreads* (last updated July 14, 2021), *available at* https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html (last visited Feb. 14, 2022).

[7] *See, e.g.*, Shane Riddell, et al., *The effect of temperature on persistence of SARS-CoV-2 on common surfaces*, Virology J. (Oct. 7, 2020), *available at* https://virologyj.biomedcentral.com/articles/10.1186/s12985-020-01418-7 (last visited Feb. 14, 2022); *see also* Neeltje van Doremalen, et al., *Aerosol and Surface Stability of SARS-CoV-2 as Compared with SARS-CoV-1*, N. Engl. J. Med. (March 17, 2020), *available at* https://www.nejm.org/doi/full/10.1056/nejmc2004973 (last visited Feb. 14, 2022); Leah F. Moriarty, et al., *Public Health Responses to COVID-19 Outbreaks on Cruise Ships – Worldwide,*

contact with these surfaces, which are known as fomites, can transmit the disease-causing virus, rendering the property dangerous and potentially fatal. When the virus is shed by an infected person onto objects and surfaces such as beds, desks, couches, doorknobs/door handles, counters, computer keyboards, and bathroom fixtures, other people can become infected by touching these surfaces and then touching their eyes, noses, or mouths.[8]

30. Accordingly, fomites transform the surface of property into a potentially deadly transmission device. A study published in the Journal of Epidemiology and Infection showed that after lockdown in the United Kingdom, fomite transmission of the coronavirus and/or COVID-19 may have contributed to as many as 25% of the deaths in that region.[9]

---

*February-March 2020*, CDC Morbidity and Mortality Weekly Report (Mar. 27, 2020), *available at* https://www.cdc.gov/mmwr/volumes/69/wr/mm6912e3.htm (last visited Feb. 14, 2022); Zhen-Dong Guo, *Aerosol and Surface Distribution of Severe Acute Respiratory Syndrome Coronavirus 2 in Hospital Wards, Wuhan, China, 2020*, CDC Emerging Infectious Disease Journal Vol. 26, No. 7-July 2020 (Apr. 10, 2020), *available at* https://wwwnc.cdc.gov/eid/article/26/7/20-0885_article (last visited Feb. 14, 2022); CDC, Boris Pastorino, Franck Touret, Magali Gilles, Xavier de Lamballerie, and Remi N. Charrel, *Prolonged Infectivity of SARS-CoV-2 in Fomites*, 26 EMERGING INFECTIOUS DISEASES 9 (Sept. 2020), *available at* https://wwwnc.cdc.gov/eid/article/26/9/20-1788_article (last visited Feb. 14, 2022).

[8] *See, e.g.*, *Coronavirus disease (COVID-19): How is it transmitted?*, WHO (last updated Dec. 23, 2021), *available at* https://www.who.int/news-room/q-a-detail/coronavirus-disease-covid-19-how-is-it-transmitted (last visited Feb. 14, 2022); *see also* CDC, Jing Cai, Wenjie Sun, Jianping Huang, Michelle Gamber, Jing Wu, Guiqing He, *Indirect Virus Transmission in Cluster of COVID-19 Cases, Wenzhou, China, 2020*, 26 EMERGING INFECTIONS DISEASES 6 (June 2020), *available at* https://wwwnc.cdc.gov/eid/article/26/6/20-0412_article (last visited Feb. 14, 2022); WHO, *Transmission of SARS-CoV-2: implications for infection prevention precautions* (Jul. 9, 2020), *available at* https://www.who.int/news-room/commentaries/detail/transmission-of-sars-cov-2-implications-for-infection-prevention-precautions (last visited Feb. 14, 2022); *see also See How Easily COVID-19 Might Spread Through A Restaurant In This Black Light Experiment* (May 14, 2020), *available at* https://www.news10.com/news/coronavirus/see-how-easily-covid-19-might-spread-through-a-restaurant-in-this-black-light-experiment/ (last visited Feb. 14, 2022).

[9] A. Meiksin, *Dynamics of COVID-19 transmission including indirect transmission mechanisms: a mathematical analysis*, 148 EPIDEMIOLOGY & INFECTION e257, 1-7 (Oct. 2020), *available at* https://www.cambridge.org/core/journals/epidemiology-and-infection/article/dynamicsofcovid19-transmission-including-indirect-transmission-mechanisms-amathematicalanalysis/A134C5182FD44BEC9E2BA6581EF805D3 (last visited Feb. 14, 2022).

31.     Additionally, an American Society for Microbiology article discussed fomite transmission involving both porous and non-porous surfaces as a mode of virus transmission. According to the researchers, "[o]nce a fomite is contaminated, the transfer of infectious virus may readily occur between inanimate and animate objects, or vice versa, and between two separate fomites (if brought together).[10]  That is, common surfaces that are frequently touched can become highly transmissive fomites for the tangible, physical coronavirus.

32.     Indeed, though microscopic, the coronavirus is a tangible, physical thing with a material existence.

33.     Thus, based on its ability to affix itself to property, including surfaces inside buildings, the coronavirus and/or COVID-19 has caused and continues to cause physical loss or damage to property (including, as discussed in more detail below, Excelsior's covered property at covered locations and property within one mile of Excelsior's covered locations), which in turn renders the property in question dangerous, uninhabitable, and unfit for its intended purpose.

34.     Third, aerosols, which are fine water droplets that are produced by normal breathing and talking, can transmit the coronavirus and are another source of physical loss or damage to property because they make the air inside buildings hazardous.  Aerosols "remain infectious when suspended in air over long distances and time.[11]  Infected aerosols are particularly dangerous indoors because they can remain "airborne indefinitely under most indoor conditions unless there

---

[10] Stephanie A. Bone and Charles P. Gerba, *Significance of Fomites in the Spread of Respiratory and Enteric Viral Disease*, 73 APPLIED AND ENVIRONMENTAL MICROBIOLOGY 6, 1687-96 (Mar. 2007) *available at* https://aem.asm.org/content/73/6/1687 (last visited Feb. 14, 2022).

[11] *Transmission of SARS-CoV-2: implications for infection prevention precautions*, WHO Scientific Brief (Jul. 9, 2020), *supra* note 11.

is removal due to air currents or ventilation."[12]  Aerosols, though, can be pulled into air circulation systems and spread to other areas in a building as well.[13]

35.    Scientific articles state that respiratory transmission via aerosols is a mode of transmission of the coronavirus and/or COVID-19.[14]  One scientific review stated that the "infectious virus can be found in aerosols and in exhaled breath samples, and it is likely that under certain circumstances, including during aerosol-generating procedures, while singing or in indoor environments with poor ventilation, the virus may be transmitted at a distance through aerosols."[15]

36.    Therefore, based on its ability to remain suspended in the air for long periods of time, especially indoors and especially where multiple people are gathered, the coronavirus and/or COVID-19 has caused and continues to cause physical loss or damage to property by making the air inside buildings hazardous.

37.    The airborne, fomite, and aerosolized transmission of the coronavirus is depicted in the below illustration:

---

[12] Kevin P. Fennelly, *Particle sizes of infectious aerosols: implications for infection control*, LANCET RESPIRATORY MED. 8:914-24 (July 24, 2020), *available at* https://www.thelancet.com/journals/lanres/article/PIIS2213-2600(20)30323-4/fulltext (last visited Feb. 14, 2022).

[13] Ramon Padilla & Javiar Zarracina, *WHO agrees with more than 200 medical experts that COVID-19 may spread via the air*, USA Today (last updated Oct. 1, 2020), *available at* www.usatoday.com/in-depth/news/2020/04/03/coronavirusprotection-how-masks-might-stopspread-throughcoughs/5086553002/ (last visited Feb. 14, 2022).

[14] *See, e.g.*, G. Kampf, Y. Bruggemann, H. Kaba, J. Steinmann, S. Pfaender, S. Scheithauer and E. Steinmann, *Potential sources, modes of transmission and effectiveness of prevention measures against SARS-CoV-2*, Journal of Hospital Infection (Dec. 2020), *available at* https://www.sciencedirect.com/science/article/abs/pii/S0195670120304370 (last visited Feb. 14, 2022).

[15] E. A. Meyerowitz, A. Richterman, R. T. Gandhi and P. E. Sax, *Transmission of SARS-CoV-2: a review of viral, host, and environmental factors*, Annals of Internal Medicine (Jan. 2021), *available at* https://www.acpjournals.org/doi/full/10.7326/M20-5008 (last visited Feb. 14, 2022).

16



17



---

[16] (Illustration), *in WHO agrees with more than 200 medical experts that COVID-19 may spread via the air*, USA Today (last updated Sept. 21, 2020), *supra* note 11.

[17] Major modes of transmission of respiratory viruses during short-range and long-range transmission (illustration), *in* Nancy H.L. Leung, *Transmissibility and transmission of respiratory viruses*, 19 NATURE REVS. MICROBIOLOGY 528-45 (Mar. 22, 2021), https://www.nature.com/articles/s41579-021-00535-6 (last visited Feb. 14, 2021).

[18]



38.     Further, presymptomatic and asymptomatic transmission is a significant challenge posed by the hazardous and often deadly coronavirus.  Persons infected but without symptoms can still transmit the virus in two different states of infection: a presymptomatic state (in individuals who are infectious before developing symptoms) and an asymptomatic state (in individuals who are infectious but never develop symptoms).  Therefore, presymptomatic and asymptomatic people infected with COVID-19 can unwittingly spread the virus by merely touching objects and surfaces

---

[18] Mikko Auvinen & Antti Hellsten (animation), Frank O'Laughlin, *3D simulation shows how a single cough can spread coronavirus through a grocery store* (Apr. 9, 2020), https://whdh.com/coronavirus/3d-simulation-shows-how-a-single-cough-can-spread-coronavirus-through-a-grocery-store/ (last visited Feb. 14, 2021).

that other persons then touch. A study published by the CDC confirmed the magnitude of this problem, estimating that transmission of the coronavirus and/or COVID-19 from asymptomatic individuals accounts for more than half of all transmissions.[19]

39. Additionally, COVID-19 has an incubation period that can last up to fourteen days.[20] Incubation is the time between when a person becomes infected and the infected person's expression of symptoms.

40. During the incubation period, or in the presymptomatic state, infected individuals can carry the greatest viral load, which is the quantity of a virus in a person's system.[21] Thus, presymptomatic and asymptomatic persons can have the greatest ability to transmit COVID-19 and pose the greatest risk to human health and property loss or damage.[22]

---

[19] Michael A. Johansson, et al., *SARS-CoV-2 Transmission From People Without COVID-19 Symptoms*, JAMA Network (Jan. 7, 2021) *available at* https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2774707 (last visited Feb. 14, 2022).

[20] WHO, *Coronavirus disease 2019 (COVID-19) Situation Report – 73* (Apr. 2, 2020), *available at* https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200402-sitrep-73-covid-19.pdf?sfvrsn=5ae25bc7_ (last visited Feb. 14, 2022).

[21] Xi He, *et al.*, *Temporal dynamics in viral shedding and transmissibility of COVID-19*, 26 NATURE MED. 672, 675 (Apr. 15, 2020), *available at* https://www.nature.com/articles/s41591-020-0869-5 (last visited Feb. 14, 2022).

[22] Seungjae Lee, MD, et al*., Clinical Course and Molecular Viral Shedding Among Asymptomatic and Symptomatic Patients With SARS-CoV-2 Infection*, JAMA (Aug. 6, 2020), *available at* https://jamanetwork.com/journals/jamainternalmedicine/fullarticle/2769235 (study revealing that viral loads were similar between the symptomatic and asymptomatic groups and actually decreased more slowly among the asymptomatic carriers, meaning that they had higher loads for longer) (last visited Feb. 14, 2022); Lirong Zou, M.Sc., et al., *SARS-CoV-2 Viral Load in Upper Respiratory Specimens of Infected Patients*, 382 NEW ENG. J. MED. 1177 (Mar. 19, 2020), *available at* https://www.nejm.org/doi/full/10.1056/nejmc2001737 ("The viral load that was detected in the asymptomatic patient was similar to that in the symptomatic patients, which suggests the transmission potential of asymptomatic or minimally symptomatic patients.") (last visited Feb. 14, 2022); Monica Ghandi, et al., *Asymptomatic Transmission, the Achilles' Heel of Current Strategies to Control Covid-19*, 382 NEW ENG. J. MED. 2158 (Apr. 24, 2020), *available at* https://www.nejm.org/doi/full/10.1056/nejme2009758 ("Ultimately, the rapid spread

41.     Additionally, unlike many other viruses that, once outside the body, do not remain infectious for long periods of time, studies show that the coronavirus is resilient and can remain infectious for weeks.  During that time, the coronavirus compromises the physical integrity of the property to which it attaches and the air in which it exists, causing physical loss or damage to such property.  The virus, therefore, renders such structures and such property uninhabitable, unusable, and unsafe for an extended period of time.

42.     Given that the coronavirus and/or COVID-19 is a pandemic and is statistically certain to be carried by a number of individuals, the coronavirus is continually reintroduced to the surfaces of, and air in, high-traffic areas, such as Excelsior's covered property at covered locations.[23]  Thus, contagious individuals, surfaces, and invisible particles suspended in the air caused physical loss or damage to Excelsior's covered property at covered locations and other properties.

43.     Unfortunately, routine cleaning and improved ventilation do not entirely remove or eliminate the coronavirus from droplets, fomites, or aerosols, like one might do with a nonhazardous microscopic substance like dust.  A recent CDC article stated that "there is little scientific support for routine use of disinfectants in community settings, whether indoor or outdoor, to prevent SARS-CoV-2 transmission from fomites." [24]

---

of Covid-19 across the United States and the globe, the clear evidence of SARS-CoV-2 transmission from asymptomatic persons, and the eventual need to relax current social distancing practices argue for broadened SARS-CoV-2 testing to include asymptomatic persons in prioritized settings.") (last visited Feb. 14, 2022).

[23] *See. e.g.*, *COVID-19 Event Risk Assessment Planning Tool*, Georgia Institute of Technology, *available at* https://covid19risk.biosci.gatech.edu/ (last visited Feb. 14, 2022).

[24] *Science Brief: SARS-CoV-2 and Surface (Fomite) Transmission for Indoor Community Environments*, Science Briefs (Apr. 5, 2021), *available at* https://www.cdc.gov/coronavirus/2019-ncov/more/science-and-research/surface-transmission.html (last visited Feb. 14, 2022).

44.     Another study concluded that the coronavirus is "much more resilient to . . . cleaning than most other respiratory viruses so tested."[25]  Additionally, the use of complex disinfectant solutions and regimens poses its own risks that could be harmful to human health and safety, especially in the contained indoor spaces where the coronavirus is at its most dangerous. A CDC article stated that "ventilation interventions can reduce the risk of exposure to the virus and reduce the spread of the disease, but they will not eliminate the risk completely."[26]

45.     Recent studies show that even extraordinary cleaning measures do not completely remove the coronavirus from surfaces.  For example, a 2021 study by New York's largest hospital network demonstrated that even after trained hospital personnel used disinfection procedures in coronavirus patient treatment areas, some of the virus still survived in those areas.[27]  Additionally, even the most aggressive cleaning regimen cannot eliminate aerosolized coronavirus particles from the air.  Just like cleaning friable asbestos particles that have landed on a surface will not remove the friable asbestos particles suspended in the surrounding air, cleaning surfaces does not lessen the deadly impact of inhaled coronavirus aerosols.

---

[25] Nevio Cimolai, *Environmental and decontamination issues for human coronaviruses and their potential surrogates*, 92 J. OF MED. VIROLOGY 11, 2498-510 (June 2020), *available at* https://doi.org/10.1002/jmv.26170 (last visited Feb. 14, 2022).

[26] Ventilation in Buildings, COVID-19 (last updated June 2, 2021), available at https://www.cdc.gov/coronavirus/2019-ncov/community/ventilation.html#:~:text=HEPA%20filters%20are%20even%20more (last visited Feb. 14, 2022); see also Wenzhao Chen, et al., Short-range airborne route dominates exposure of respiratory infection during close contact, BUILDING & ENV'T 176 (June 2020), available at https://www.sciencedirect.com/science/article/abs/pii/S0360132320302183 (last visited Feb. 14, 2022) ("[G]eneral ventilation cannot prevent transmission.").

[27] Zarina Brune et al., *Effectiveness of SARS-CoV-2 Decontamination and Containment in a COVID-19 ICU*, 18 INT'L J. ENV'T RSCH. & PUB. HEALTH 5, 2479 (Mar. 3, 2021), https://www.mdpi.com/1660-4601/18/5/2479 (last visited Feb. 14, 2022).

46.     Consequently, and to help reduce the presence of the virus in indoor spaces, some scientists recommend the use of HEPA and other specialized air filtration systems.[28]  In other words, physical alteration of property is necessary to repair and help make it safe from the coronavirus and return the property to a useable and inhabitable state.

47.     Because even extraordinary cleaning and state-of-the-art ventilation cannot consistently remove or eliminate the coronavirus, they likewise cannot remove or eliminate the risk of individuals contracting COVID-19 from infected droplets, fomites, and aerosols.

48.     Given the ubiquity and pervasiveness of the coronavirus and/or COVID-19, no amount of cleaning or ventilation intervention will prevent a person infected with the coronavirus from entering an indoor space and dispersing millions of infected particles onto surfaces and in the air, physically altering, transforming, and damaging surfaces and the air, turning surfaces into disease-transmitting fomites and making the property uninhabitable, unsafe, and unfit for its intended purposes.

49.     Because the coronavirus and resulting COVID-19 disease cause physical property and physical space within and around properties to lose their functionality and ability to generate revenue, businesses such as Excelsior's suffered income loss and incur extra expenses.

50.     The coronavirus also continues to evolve, further stymying efforts to control the pandemic.  Multiple variants of the coronavirus are circulating globally, including the Delta variant, the highly-contagious Omicron variant, as well as variants originating in the United Kingdom, South Africa, Brazil, and California.[29]  Ongoing research suggests these variants may

---

[28] Zeynep Tufeckci, *We Need to Talk About Ventilation*, The Atlantic (July 30, 2020), available at https://www.theatlantic.com/health/archive/2020/07/why-arent-we-talking-more-about-airborne-transmission/614737/ (last visited Feb. 14, 2022).

[29] *What You Need to Know about Variants*, COVID-19 (last updated Sept. 20, 2021), *available at*

spread more easily and quickly, making the coronavirus even more dangerous and damaging to persons and property.

51.     Despite the sustained global effort to contain the coronavirus and/or COVID-19, it is beyond dispute that the virus and disease can be anywhere and everywhere, directly causing physical loss or damage to life and property.  Furthermore, the coronavirus is especially dangerous indoors where it cannot be entirely removed from surfaces or the air.  Thus, the coronavirus and/or COVID-19 makes property unsafe, uninhabitable, and unfit for its intended purpose and directly causes physical loss or damage to property, including, as discussed below, to Excelsior's covered property at covered locations.

**III.    In Response to Direct Physical Loss and Damage to Property Caused by COVID-19, Civil Authority Orders Limited, Restricted, or Prohibited Partial or Total Access to Property and Travel**

52.     Italy reported its first COVID-19 case on February 22, and on January 30, the WHO declared the pandemic a "Public Health Emergency of International Concern."  On March 8, 2020, the Italian government issued a decree installing strict public health measures in affected areas, including social distancing.  Three days later, these measures were extended to all of Italy, imposing far-reaching social-distancing measures.

53.     Italy's most significant round of Orders in March 2020 included the suspension of all education and sport activities, the limitation on movement of people (regardless of whether affected by the virus) unless justified by approved work, health or urgent needs, the cancellation of all public events and the prohibition of any large gathering of people in public or places (including cinemas, theatres, museums), as well as the closure of most shops and retail activities

---

https://www.cdc.gov/coronavirus/2019-ncov/transmission/variant.html (last visited Feb. 14, 2022).

(other than certain essential services like grocery stores and pharmacies).  These restrictions had the effect of cancelling all events, conferences, fairs, shows, and other large gatherings in Rome, which typically would attract visitors to the Westin Excelsior Rome and its bars and restaurant.

54.　　By March 2020, it was clear that drastic action had to be taken to slow down the rate of infections.  Many countries and local governments then began to impose sweeping restrictions on residents' daily lives and property to protect them and stop the spread.  Most states restricted or prohibited the operation of non-essential business or required individuals to stay at home except for essential purposes.  In an attempt to stop the international spread, severe travel restrictions, both in and out of Italy, were imposed in early 2020.  The Westin Excelsior Rome regularly saw tourists from China and South Korea before the pandemic; this travel was halted early in 2020.

55.　　Around the world, cities whose residents would normally travel to Europe were prevented from doing so by both European and domestic restrictions.  On March 30, 2020, the European Commission released guidance temporarily restricting non-essential travel into countries within the European Union.[30]  Further, many countries, including Spain and the United States, banned entry of travelers coming from Italy, and others imposed a quarantine period for travelers coming from Italy.  Even in early 2021, non-U.S. citizens were still not permitted to enter (or return to) the United States within 14 days of being in Italy.

56.　　In addition to governmental travel bans, most international airlines stopped or severely reduced flights to or from Italy during Spring of 2020.

_____

[30] EUROPEAN COMMISSION, *Coronavirus: Commission presents practical guidance on implementing the temporary restriction on non-essential travel to the EU*, March 30, 2020, https://ec.europa.eu/commission/presscorner/detail/en/ip_20_543 (last visited Feb. 10, 2022).

57.     United States federal and local restrictions impacted travel to Italy and further demonstrated that COVID-19 causes property damage wherever it is present. For example, New York Mayor Bill De Blasio signed a series of stay-home orders and explained that these drastic measures were needed because of the unique characteristics of the novel coronavirus and, of particular relevance here, stating that "the virus physically is causing property loss and damage[.]"

58.     The local and national Italian decrees imposed significant restrictions on people and businesses in the country to attempt to slow and stop the spread of COVID-19 and/or coronavirus, which is a physical substance that attaches to, and remains on property—including Excelsior's property and property within 15 miles of the Westin Excelsior Rome—physically permeating and altering the air around such property and making it unsuitable for its intended use and/or severely limiting Excelsior's use of its property and business.

59.     Though the Orders and travel restrictions did not mandate the closure of hotels, they impaired and restricted access to the insured property, and effectively made it impossible for the Westin Excelsior Rome to conduct business. The limitation on movement into, from, and within Italy, the cancellation of all public events and prohibition on large gatherings, and the significant reduction of international flights into Italy did not close the Westin Excelsior's doors, but rendered hotels unable to operate by making it impossible for people to travel to Rome unless for a limited set of urgent needs.

60.     The effects of the pandemic and the resulting Orders continue to cause business interruption losses for Excelsior. Months after the initial round of restrictions, the Italian government imposed renewed decrees in October and November 2020, responding to the continuing physical damage caused by COVID-19 and/or coronavirus. The decrees continued to restrict movement between the different regions in Italy and imposed a curfew restricting people's

movement within the region between the hours of 10:00 PM and 5:00 AM, unless justified by work or an emergency. As the decrees within Italy continued to limit activity within Italy, travel to Italy was also still nearly impossible, further limiting access for travelers to the Westin Excelsior Rome.

**IV.** **The Presence of Coronavirus and/or Covid-19 and Resulting Civil Authority Orders Caused Direct Physical Loss or Damage to the Westin Excelsior Rome, Causing Excelsior to Suffer Severe Losses and Incur Extra Expenses**

61. Excelsior owns the Westin Excelsior Rome, which is part of the Marriott chain of hotels.

62. The Westin Excelsior Rome is a historic 5-star hotel that has been operating since 1906. Part of its appeal and commercial success comes from its location on one of the most celebrated and talked about streets of Rome, the Via Veneto, and its proximity to Rome's main attractions, including the Spanish Steps and the Borghese Gardens Gallery.

63. The Westin Excelsior Rome has 316 guest rooms, two bars, a restaurant, and 12 rooms to be rented out for events or meetings. Before the pandemic upended domestic and international travel, the Westin Excelsior Rome was popular among both national and international travelers, with more than half of its guests traveling from the United States. The Westin Excelsior Rome also routinely hosted guests from Asia, including China and South Korea. The Westin Excelsior Rome regularly hosted film shootings. Many of its rooms were also regularly occupied by United States airlines' flight crews.

64. Beginning in February 2020, however, as travel throughout Europe and around the world was severely restricted, the Westin Excelsior Rome's bookings decreased to virtually nothing. Events and filming ceased. With flights stopped or severely restricted, flight crews no longer needed hotel rooms in Rome. Huge amounts of guest bookings were cancelled in response to the pandemic and/or the Orders, and new bookings were not made. Other countries, including

the United States, banned entry of non-citizens who had traveled to Italy, and Italy imposed its own travel restrictions on travelers from other countries.

65.     As of March 31, 2020, all of the Westin Excelsior Rome's 316 guest rooms sat empty, bringing in no revenue.  Bookings at the hotel's restaurant, bars, meeting spaces, and wellness center were also cancelled or rendered impossible, decimating Excelsior's revenue.

66.     Beginning with this complete halt in bookings and revenue, Excelsior incurred significant costs and losses caused by the coronavirus pandemic, costs and losses that are mounting every day.

67.     The presence of COVID-19 and/or coronavirus in, on, and around the Westin Excelsior Rome in multiple physical, and tangible forms caused and continues to cause physical loss of or damage to the insured property and render it unusable, unsafe, and unfit for its intended purpose.  Multiple guests and at least six employees of Excelsior tested positive for COVID-19, confirming that the virus was present at the Westin Excelsior Rome and caused loss or damage to the property.  That is the reason why the Westin Excelsior Rome's bookings and revenue were entirely halted.  Many of Excelsior's financial losses resulted directly from these cases of COVID-19 on its property.

68.     As a result, the sustained and unavoidable physical loss or damage to Excelsior's covered property at covered locations and to other property caused by the coronavirus and/or COVID-19 caused Excelsior to suffer numerous types of losses during the Policy's applicable "periods of indemnity," including but not limited to:

- Loss of gross earnings and/or gross profits due to physical loss or damage to Excelsior's covered property by way of COVID-19 on the premises, resulting in loss of bookings revenue from the hotel's guest rooms, restaurants, bars, and meeting spaces and loss of revenue from cancelled events;

22

- Costs and efforts to remove the coronavirus from covered property and to repair, rebuild, replace, protect, and preserve covered property, including, but not limited to, adding safety dividers, and sanitation stations and purchasing additional cleaning supplies, cleaning services, hygiene supplies, and personal protective equipment, such as hand sanitizer, antibacterial soap, gloves, masks, plexiglass dividers, thermostats, paper products, QR code menus, safety information stands, and signs;

- Costs incurred to implement new sanitation procedures, including but not limited to sanitizing rooms of infected guests after they depart, sanitizing workspaces of infected employees, and employing a third party to disinfect the hotel with Electrostatic Sprayer technology.

- Extra expenses incurred to temporarily continue as nearly normal as practicable the conduct of Excelsior's business, including, but not limited to, the extra expenses listed above as well as extra expenses incurred from the costs and efforts to transition employees to working virtually and training employees regarding policy and procedural changes as a result of cleaning requirements, and other business changes;

- Extra expenses incurred to employ additional security staff necessary to control access to the Westin Rome Excelsior, ensuring only staff and guests with green passes entered the premises;

- Losses sustained and extra expenses incurred of the sorts described above resulting from the partial or total prevention of physical ingress to or egress from Excelsior's covered locations because of direct physical loss or damage to property within one mile of Excelsior's covered locations;

- Losses sustained and extra expenses incurred of the sorts described above resulting from the partial or total prohibition of access to Excelsior's covered locations because of civil authority "stay-at-home" orders issued by various governmental officials that limited, restricted, and/or prohibited access to property within one mile of Excelsior's covered locations;

- Losses sustained and extra expenses incurred, including under the contingent time element coverage, of the sorts described above resulting from physical loss or damage at Excelsior's direct customers and suppliers, which wholly or partially prevented the same from supplying their goods or services to Excelsior and/or accepting goods or services from Excelsior;

- Financial hardship faced when Excelsior was forced to renegotiate its loan or the Westin Excelsior Rome due to lack of guest revenue resulting directly from the physical loss or damage caused by COVID-19 and the Orders.

69. Excelsior would not have suffered these losses and incurred these extra expenses during the same period had no physical loss or damage occurred, and Excelsior has taken reasonable steps to mitigate its losses wherever possible. Accordingly, as a direct result of Excelsior's physical loss or damage to covered property discussed above, Excelsior sustained and continues to sustain losses of gross earnings, gross profits, additional operational expenses, extra expenses, increases in the costs of doing business, and/or other covered losses, and is entitled to payment for these losses and extra expenses under the terms and provisions of the Policy.

70. The precise scope of Excelsior's losses and detailed scientific explanations of the direct physical loss and/or damage suffered by Excelsior will be established through fact and expert discovery in this action.

## V. <u>Zurich Knew the Risks of a Global Pandemic Loss and Was Aware that Such Loss Could Trigger Its Property Coverage</u>

71. The insurance industry generally and Zurich specifically have known for many years, if not decades, about the risks of a global pandemic.

72. There have been many publicly available reports and articles about the risks of a global pandemic in the last several years. For example, in 2013, Willis Towers Watson published the results of a survey of insurance executives from around the world entitled "Extreme Risks 2013" in which more than 30,000 votes were cast. The number one extreme risk identified by survey participants was a pandemic—that is, a "new highly infectious and fatal disease spreads through human, animal or plant populations worldwide."[31] In 2015, scientists at AIR Worldwide published an article called "Quantifying Pandemic Risk," containing the byline: "The recent West

---

[31] *See Insurers rate global pandemic as the major extreme risk*, Actuarial Post (undated), *available at* https://www.actuarialpost.co.uk/article/insurers-rate-global-pandemic-as-the-major-extremerisk-5705.htm (last visited Feb. 14, 2022).

Africa Ebola outbreak serves as a reminder that it is important for actuaries to account for and quantify pandemic risk."[32]   Again, in an article from 2018, "What the 1918 Flu Pandemic Can Teach Today's Insurers," scientists modeled the effects of a modern-day 1918 pandemic and estimated that "a modern day Spanish flu would cause between 21 and 33 million deaths worldwide."[33] These articles and others demonstrate that Zurich knew of the risks of a global pandemic.

73.     Furthermore, in 2006, shortly after the 2003 outbreak of Severe Acute Respiratory Syndrome, also known as SARS, which was an airborne viral respiratory disease that spread through small droplets of saliva,[34] just like COVID-19, the Insurance Services Office ("ISO") drafted new endorsements that it filed with state insurance regulators in all ISO jurisdictions and recommended to the independent bureaus in other jurisdictions to address the exclusion of loss due to virus or bacteria.[35]   The ISO circular specifically states that viruses such as the rotavirus, SARS, and the influenza (such as the avian flu) may "enable the spread of disease by their presence

---

[32] J. Douglas Fullam, ASA, Nita Madhav, MSPH, CCM, Quantifying Pandemic Risk, The Actuary Magazine 12:1 (February/March 2015), available at https://www.soa.org/globalassets/assets/Library/Newsletters/The-Actuary-Magazine/2015/february/act-2015-vol12-iss1-fullam.pdf (last visited Feb. 14, 2022).

[33] Narges Dorraltaj, Ph.D., Doug Fullam, ASA, *What the 1918 Flu Pandemic Can Teach Today's Insurers*, AIR Currents (Mar. 29, 2018), *available at* https://www.airworldwide.com/publications/air-currents/2018/What-the-1918-Flu-Pandemic-Can-Teach-Todays-Insurers/ (last visited Feb. 14, 2022).

[34] *See, e.g.*, *Severe Acute Respiratory Syndrome (SARS)*, World Health Organization (undated), *available at* https://www.who.int/health-topics/severe-acute-respiratory-syndrome#tab=tab_1 (last visited Feb. 14, 2022).

[35] *New Endorsements Filed to Address Exclusion of Loss Due to Virus or Bacteria*, ISO Circular (July 6, 2006), *available at* https://www.propertyinsurancecoveragelaw.com/files/2020/03/ISOCircular-LI-CF-2006-175-Virus.pdf (last visited Feb. 14, 2022).

on interior building surfaces [resulting in] potential claims [for] business interruption (time element) losses."[36]

74.     Zurich chose not to include the virus exclusion ISO drafted, which exclusion many insurance carriers have used in their "all risks" property and business interruption policies. Zurich also chose not include an exclusion specifically for pandemics, which was also available in the marketplace.

## VI.     **The Policy**

75.     In exchange for a substantial premium, Zurich sold Marriott (for the benefit of participating hotels, including the Westin Excelsior Rome) an "All Risks" Commercial Property Insurance Policy No. PPR 3700638-17 for policy period April 1, 2019 to April 1, 2020 (the "Zurich Policy").  Zurich Policy at 10 of 135.  The Zurich Policy is attached hereto as Exhibit 1.[37]

76.     The Policy identifies the Named Insured as Marriott and provides that other entities that operate Marriott hotels and are identified by Marriott will also be insureds under the Policy. Excelsior was also provided a Certificate of Insurance confirming the Westin Excelsior Rome's insured status under the Policy.  Accordingly, Excelsior is an Insured under the Policy.

77.     The Policy Limit is $1.5 billion per occurrence, subject to a $25,000 deductible per Occurrence.

78.     The Policy is designed to cover exactly the type of costs and losses Excelsior has suffered due to the COVID-19 pandemic: losses due to interruption by communicable disease, and costs and losses arising out of the physical loss of its property or damage to its property.

---

[36] *Id.*

[37] Despite requests to Marriott, who procured the Policy on Excelsior's behalf, Excelsior has only been provided a redacted version of this Policy.

79. Unless damage is clearly included within a listed Limit of Liability, the full Policy Limit of the Policy is available for Excelsior's damages.

80. Unless otherwise stated, the Limits of Liability in the Policy are on a per occurrence basis.

81. "Occurrence" is defined as "the sum of all loss or damage insured against, irrespective of the number of locations involved, arising out of or caused by any one disaster, loss or series of disasters, accidents or losses arising out of one event." Policy at 67 of 79.

82. The Policy contains a broad grant of coverage for property damage and time element coverage, stating that they cover "all risks of direct physical loss of or damage, except as hereinafter excluded." Policy at 15 of 79.

83. The Policy's Time Element coverage provides: "This Policy insures Time Element loss, as provided in the Time Element Coverages, directly resulting from direct physical loss or damage of the type insured by this Policy," including "Business Interruption Loss[:] the Actual Loss Sustained by the Insured . . . during the Period of Liability," and "Extra Expense loss[:] the reasonable and necessary extra costs incurred by the Insured . . . during the Period of Liability." Policy at 35–37 of 79.

84. **Period of Liability** is defined as "the period: a) starting from the time of direct physical loss or damage of the type insured against; and b) ending when with due diligence and dispatch the building and equipment could be: (i) repaired or replaced; and (ii) made ready for operations, under the same or equivalent physical and operating conditions that existed prior to the damage." The **Period of Liability** is not limited by the expiration of the Policy. Policy at 49–50 of 79.

85. For Cancellation of Bookings coverage specifically, **Period of Liability** means "The length of time for which loss may be claimed shall not exceed such length of time as would be required with the exercise of due diligence and dispatch to restore the Insured's business to the condition that would have existed had no loss occurred and shall include the time required to make the premises conform to the order of a competent public authority, beginning with the interruption or interference with the business and ending not later than 365 days thereafter." Policy at 46 of 79.

86. As part of the Policy's Time Element coverage, the Policy covers Excelsior's actual loss sustained, loss of rents, and Extra Expense.

87. The Declarations page does not list a sublimit for Business Interruption.

88. "Extra Expense" means "extra expenses to temporarily continue as nearly normal as practicable the conduct of the Insured's business" and "extra costs of temporarily using property or facilities of the Insured or others, less any value remaining at the end of the Period of Liability for property obtained in connection with the above. Policy at 37–38 of 79.

89. For each occurrence, Extra Expense coverage is subject to a $200,000,000 sublimit.

90. The Policy also includes several specific special coverages with per occurrence sublimits, including but not limited to:

| Special Coverage | Per Occurrence Sublimit |
|---|---|
| Contingent Time Element | $200 million |
| Civil or Military Authority | 90 days |
| Ingress/Egress | 90 days |
| Leasehold Interest | $150 million |

91. The Policy specifically recognizes that the presence of a communicable or infectious disease causes direct physical loss of or damage to property, and as such is specifically insured against in the Cancellation of Bookings coverage. Specifically, the Policy provides:

This policy is extended to cover the Actual Loss Sustained by the Insured during a Period of Liability resulting from:

    **a.**    The cancellation of, and/or inability to accept bookings or reservations for accommodation, and/or interference with the business at any Insured Location; and/or

    **b.**    The cancellation of, and/or inability to accept bookings or reservations, and/or the interruption of, or interference with the business at any restaurant, spa, golf course, health club or other facility of the Insured at any Insured location

All as a direct result of . . . the outbreak of contagious and/or infectious disease as well as restrictive guidance or travel advisories placed on a region or area by Centers for Disease Control, World Health Organization, or comparable authority . . . within a radius of 5 miles of an Insured Location to the extent such Time Element loss is not otherwise covered under this Policy such as under the Civil Authority or Military Authority, Ingress/Egress, or Contingent Time Element extensions.

Policy at 44–45 of 79.

92.    The Cancellation of Bookings coverage extension is subject to a $5 million sublimit in the aggregate.

93.    The Policy also covers Excelsior's "Decontamination Costs" as follows:

If insured property is **contaminated** as a result of direct physical damage insured by this Policy and there is in force at the time of the loss any law or ordinance regulating contamination, including but not limited to the presence of pollution or hazardous material, including Asbestos, then this Policy covers, as a result of enforcement of such law or ordinance, the increased cost of decontamination and/or removal of such contaminated insured property in a manner to satisfy such law or ordinance. Additional Coverage applies only to that part of insured property so contaminated as a result of insured physical damage.

[MISSING CITE TO POLICY?]

94.    The Policy provides coverage for "Interruption by Civil or Military Authority."

Specifically, the Policy provides:

This Policy is extended to insure loss sustained by the Insured during the period of time when, as a result of physical loss or damage not otherwise excluded herein, to the kind of property not otherwise excluded herein and access to the property of the insured is impaired by order or action of civil or military authority.

Policy at 48 of 79.

95.     For each occurrence, the Civil or Military Authority special coverage is subject to a 90-day time limitation.

96.     The Policy's "Ingress/Egress" special coverage provides:

> This Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured due to the necessary interruption of the Insured's business due to impairment of ingress to or egress from an Insured Location, whether or not the premises or property of the Insured is damaged, provided that such impairment is a direct result of direct physical damage of the type insured by this Policy, to the kind of property not excluded by this Policy.

Policy at 44 of 79.

97.     For each occurrence, the Ingress/Egress special coverage is subject to a 90-day time limitation.

98.     The Policy contains numerous other special coverages that may cover Excelsior's ongoing costs and losses as it continues to battle COVID-19 and its long-term impact on the travel industry, including: Contingent Time Element, and Protection and Preservation of Property.

99.     The Westin Excelsior Rome is an insured property under the Policy, and the insured damages include Excelsior's loss of gross earnings, extra expense, and increased costs.

100.    Operating a hotel that relies on the possibility of international travel, Excelsior understood that it would be severely impacted in the event of a pandemic such as COVID-19, and it reasonably expected that the Policy would cover such losses arising from such a pandemic. Excelsior's reasonable expectation is based upon, among other things, the broad language in the Policy, the express coverage for losses resulting from contagious disease, the express coverage for decontamination costs, and the fact that the Policy does not contain language excluding losses resulting from viruses or diseases.

101.    Moreover, none of the Policy's exclusions preclude Excelsior's claim for coverage. Rather, the "Contamination" exclusion only applies to traditional environmental and industrial pollution.  It has no effect on claims arising from the presence of the novel coronavirus at or surrounding Excelsior's property, the constant imminent threat of its presence, or the associated government action in response to the pandemic.

102.    Excelsior has paid all premiums due to Defendant to purchase the Policy, complied with all applicable duties under the Policy, and satisfied the applicable deductible.

**VII.    Zurich Wrongly Denied Excelsior's Claim for Coverage Under the Policy**

103.    In March 2020, when Italy was among the hardest-hit countries in the world by COVID-19, and the Westin Excelsior Rome had zero of its 316 rooms occupied, Excelsior submitted a detailed claim for coverage under the Policy.  Excelsior provided an explanation and quantification of its losses to its broker to be provided to Defendant.

104.    Defendant ignored Excelsior's claim.

105.    Having received no response from Defendant for nearly ten months, Excelsior submitted a second claim on December 15, 2020, after new governmental orders by the Italian government restricted access to the Westin Excelsior Rome.

106.    Again, Defendant ignored Excelsior's claim.

107.    Upon information and belief, Defendant has taken the position that the Policy does not provide coverage for loss of revenue for the coronavirus outbreak because it does not involve "physical loss or damage to property."  Further, Excelsior understands Defendant has taken the position that the annual aggregate limit for Cancellation of Bookings was exhausted by other program participants before the coronavirus outbreak.

108.    In failing to respond to Excelsior's claim for coverage, Defendant ignores that COVID-19 and SARS-CoV-2 cause physical loss of or damage to Excelsior's property, and thus Excelsior's losses are covered under the Policy's insuring agreements for Property Damage and Time Element and numerous special coverages, including, but not limited to, Contingent Time Element, Ingress/Egress, Protection and Preservation of Property, and Extra Expense.  Finally, Defendant ignores that Excelsior's losses result from a number of causes other than the virus or disease, including, but not necessarily limited to, the pandemic, governmental negligence, or the Orders, all of which are other covered causes of loss under the Policy and constitute direct physical loss of Excelsior's property and direct physical damage to Excelsior's property.

109.    Excelsior's claim is not barred by any exclusions under the Policy.  Zurich did not define "microorganism" in the Policy and did not identify a "virus" as a microorganism in the Policy.   Further, there is no consensus among courts as to whether the definition of "microorganism" includes viruses.   Indeed, most biologists do not consider viruses to be microorganisms as they are not living.[38]  Certainly a reasonable policyholder such as Excelsior would not have expected physical damage relating to a virus to be barred by a "microorganism" exclusion.

110.    The total lack of response from Defendant sent a clear message that they do not intend to pay for all of, or indeed any of, Excelsior's significant costs and losses covered under the Policy.

---

[38] UNIVERSITY OF BERGEN, *What are microorganisms?*, available at https://www.uib.no/en/geobio/56846/what-are-microorganisms#:~:text=Technically%20a%20microorganism%20or%20microbe,generally%20classified%20as%20non%2Dliving (last visited Feb. 14, 2022).

111.    Defendant's refusal to respond has further harmed Excelsior by depriving it of the benefit of the bargain it purchased in the Policy. Defendant's position has forced Excelsior to fight a two-front battle, both against the COVID-19 pandemic that decimated its business, but also to obtain coverage to which it is clearly entitled. Excelsior comes to this Court to force Defendant to provide the coverage Excelsior purchased and is owed under the Policy.

### FIRST CAUSE OF ACTION
**(Breach of Contract)**

112.    Excelsior repeats and realleges the allegations set forth in the foregoing paragraphs as if fully set forth herein.

113.    The Policy constitutes a valid and enforceable contract between Excelsior and Defendant.

114.    As described above, Excelsior has sustained, and is continuing to sustain, costs and losses covered under the Policy and during the Policy period.

115.    Excelsior provided prompt notice of its costs and losses, performed all obligations required of it under the Policy, and/or was ready, willing, and able to perform its obligations under the Policy at the time Defendant refused to provide coverage to Excelsior under the Policy.

116.    Under the terms of the Policy, Defendant must pay for any costs or losses covered under the Policy, subject only to policy limits, sublimits, time limits, and/or deductibles for specific coverages.

117.    Defendant has not paid any amounts to Excelsior in connection with its claim. Instead, Defendant has asserted various inapplicable bases to wrongfully deny coverage for Excelsior's claim.

118.    As a direct and proximate result of Defendant's breach of contract, Excelsior has suffered and will continue to suffer damages in an amount to be determined at trial, plus

consequential damages, attorneys' fees, and pre- and post-judgment interest to the extent permitted by law.

## SECOND CAUSE OF ACTION
### (Declaratory Judgment)

119.    Excelsior repeats and realleges the allegations set forth in the foregoing paragraphs as if fully set forth herein.

120.    Under the terms of the Policy, Defendant must for any costs or losses covered under the Policy, subject only to policy limits, sublimits, time limits, and/or deductibles for specific coverages.

121.    As detailed above, Excelsior's costs and losses are covered under the Policy and are not excluded from coverage.

122.    Defendant disputes its legal obligation to pay Excelsior's claim.

123.    An actual and justiciable controversy presently exists between Excelsior and Defendant concerning the proper construction of the Policy, and the rights and obligations of the parties thereto, with respect to Excelsior's claim for costs and losses arising out of the coronavirus outbreak.

124.    Excelsior seeks a declaratory judgment in favor of Excelsior and against Defendant declaring that Excelsior is entitled to coverage under the Policy.

125.    A declaratory judgment would be useful in resolving this case or controversy. Excelsior's costs and losses are ongoing.  By clarifying the parties' rights and duties under the Policy, a declaratory judgment would guide Defendant's treatment of Excelsior's covered, but unaccrued, costs and losses, in addition to the significant damages Excelsior has already accrued. Because Excelsior's accrued costs and losses have not yet ripened such that a final amount of

damages can be ascertained, the declaratory judgment claim would afford Excelsior relief independent of the breach of contract claim.

## PRAYER FOR RELIEF

WHEREFORE, Excelsior prays for relief as follows:

a.      On the First Cause of Action, Excelsior requests that the Court enter judgment against Defendant, awarding Excelsior damages in an amount to be determined at trial, plus consequential damages, attorneys' fees, and pre- and post-judgment interest to the extent permitted by law;

b.      On the Second Cause of Action, Excelsior requests that the Court enter a declaratory judgment in favor of Excelsior against Defendant that Excelsior's costs and losses are covered under the Policy and declaring that Defendant is required to pay Excelsior, up to the applicable limits, for claimed amounts under the Policy.

c.      For all Causes of Action, all pre-judgment and post-judgment interest as allowed by law and all costs incurred as a consequence of having to prosecute this lawsuit, including attorneys' fees; and

d.      Excelsior requests such other and further relief as the Court deems just and proper.


## JURY DEMAND

Excelsior hereby demands a trial by jury on all issues so triable.

Dated: February 14, 2022

By: /s/ Jeffrey M. Hansen

Jeffrey M. Hansen (ARDC 6269900)
Douglas A. Albritton (ARDC 6228734)
ActuateLaw, LLC
641 West Lake Street, 5th Floor
Chicago, Illinois 60661
(312) 579-3124
jeff.hansen@actuatelaw.com
doug.albritton@actuatelaw.com

Robin L. Cohen
Meredith Elkins
COHEN ZIFFER FRENCHMAN &
MCKENNA LLP
1350 Avenue of the Americas, 25th Floor
New York, New York 10019
Tel: (212) 584-1890
rcohen@cohenziffer.com
melkins@cohenziffer.com

*Attorneys for Plaintiff Q Excelsior Italia Srl*